# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LEVAR KING** | **CIVIL ACTION** |
| **VERSUS** | **NO. 07-7410** |
| **BURL CAIN, WARDEN** | **SECTION "F" (6)** |

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.

Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing. *See* 28 U.S.C. § 2254(e)(2). Accordingly, it is recommended that the petition be **DENIED WITH PREJUDICE.**

**I. PROCEDURAL HISTORY**[1]

Petitioner, Levar King, is a prisoner presently incarcerated in the Louisiana State Penitentiary, located in Angola, Louisiana. On June 13, 2001, petitioner was charged with one count of armed robbery. On June 29, 2001, the district court heard and denied petitioner's motion to suppress the identification. On December 10, 2001, petitioner's first trial ended in a mistrial. On or about February 5, 2002, following a second trial, a twelve-person jury found petitioner guilty as charged. On March 8, 2002, petitioner filed a motion for a new trial. On May 17, 2002, the district court heard and denied petitioner's motion for a new trial. On July 2, 2002, the district court, pursuant to the filing of a multiple bill, found petitioner to be a second felony offender and sentenced him, in accordance with LSA-R.S. 15:529.1, to serve forty-nine and one half years imprisonment at hard labor. On December 10, 2003, the Louisiana Fourth Circuit Court of Appeal affirmed petitioner's conviction and sentence. *State v. King*, No. 2002-KA-2519 (La. App. 4 Cir. Dec. 10, 2003) (unpublished opinion). On February 4, 2005, the Louisiana Supreme Court denied petitioner's writ application, thereby rendering his conviction and sentence final. *State ex rel. King v. State*, 893 So.2d 89 (La. 2005).

---

[1] A portion of the procedural history was taken from the Louisiana Fourth Circuit Court of Appeal's decision, *State v. King,* No. 2002-KA-2519 (La. App. 4 Cir. Dec. 10, 2003) (unpublished opinion). A copy of the Louisiana Fourth Circuit's unpublished opinion is contained in the State rec., vol. 2 of 6.

Following the conclusion of his direct appeal proceedings, petitioner sought post-conviction relief, claiming that he received ineffective assistance of counsel. On August 11, 2006, Orleans Parish Criminal District Court Judge Raymond Bigelow denied petitioner's post-conviction relief application.[2] On September 29, 2006, the Louisiana Fourth Circuit Court of Appeal denied petitioner's writ application for post-conviction relief. *State v. King*, No. 2006-K-1227 (La. App. 4 Cir. Sept. 29, 2006) (unpublished opinion).[3] On August 31, 2007, the Louisiana Supreme Court also denied petitioner post-conviction relief. *State ex rel. King v. State*, 962 So.2d 432 (La. 2007).

On September 27, 2007, petitioner signed the instant federal habeas corpus action, arguing that he received ineffective assistance of counsel and that the trial court erred in failing to conduct an evidentiary hearing in connection with his post-conviction application wherein he raised his ineffective assistance of counsel claim. The State, in its response (rec. doc. 8), concedes that petitioner's federal habeas petition is timely and that petitioner has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982). Accordingly, the court shall proceed to address the merits of petitioner's claims following a recitation of the applicable facts and standard of review.

---

[2]A copy of the district court's adverse opinion is contained in the State rec., vol. 3 of 6.

[3]A copy of the Louisiana Fourth Circuit's unpublished opinion is contained in the State rec., vol. 3 of 6.

## III. FACTS[4]

Around noon on April 30, 2001, Yuan Ortega and her husband Carlos were working in the office of a storage facility at 4700 Tchoupitoulas Street. While Ms. Ortega stood behind the counter of the office, her husband was sweeping near the front door. Someone rang the doorbell, and Mr. Ortega glanced out the door's window to see two men standing outside. Believing they were customers coming to pay for rentals at the storage site, Mr. Ortega opened the door and then turned his back on them and resumed sweeping as they entered.

Mr. Ortega testified at trial that one of the men immediately grabbed him from behind and placed his arm around Mr. Ortega's neck. He testified that the other man went to the counter and confronted Ms. Ortega with a gun. Mr. Ortega also testified that both men demanded money, and when his wife appeared to freeze, he implored his wife to give them the money. Mr. Ortega testified that due to the position in which he was placed, he could not fully see the man holding him, but he noticed the man had many gold teeth. Mr. Ortega further testified that when the man threatened to kill him if Ms. Ortega did not hand over the money, he recognized the voice as that of Levar King, a person who had previously been employed by the storage facility. King had done some construction repair work at the site, and had entered the office many times to use the bathroom and water fountain. Mr. Ortega

---

[4]The facts are taken from the Louisiana Fourth Circuit's opinion on direct appeal, *King*, No. 2002-KA-2519.

also testified that after his wife complied with the demand for money, the man at the counter told King to move Mr. Ortega over to the counter. The robbers then ordered Mr. and Ms. Ortega onto the floor. Mr. Ortega testified that he heard his wife beg the robbers not to shoot them, and after a short time they realized the robbers had gone.

Mr. Ortega also testified that he then called the police while his wife went to the main office located on the premises. When the police arrived, Mr. Ortega and his wife explained what had happened, and told the officer that one of the robbers, the man who had held Mr. Ortega while the other man took the money from Ms. Ortega, was Levar King. Mr. and Ms. Ortega obtained King's employment application and gave it to the officers. Mr. Ortega testified that an officer left and then returned soon thereafter with a photograph which he separately showed to the victims. Mr. Ortega testified that the photograph was of Levar King, who he indicated was one of the robbers. Mr. Ortega then signed the back of the photograph. Mr. Ortega further testified that the office had surveillance cameras, which inadvertently had not been activated on the day of the robbery . Mr. Ortega positively identified Levar King as the man who held him during the robbery.

Yuan Ortega testified at trial that she was working behind the counter on the day of the robbery. She testified that her husband dropped her off at the office that morning, and then left to take their daughter to day care before returning to the office. Ms. Ortega testified that as per her routine, she took the old videotape out of the surveillance system, and

rewound a tape for use on that day. At that point, the telephone rang, and she spoke with a customer for some time. Because of this interruption, she neglected to restart the surveillance cameras, which resulted in no videotaping of the robbery later that day.

Ms. Ortega also testified that she was behind the counter around noon when the doorbell rang and her husband let two men in the door. She testified that she recognized one of the men as Levar King, who had worked on the site the prior summer and with whom she had spoken when he had entered the office many times to use the bathroom and water fountain. She testified that when King grabbed her husband, she thought at first that he was hugging her husband. However, both King and the other man began yelling for her to give them money, as King held her husband by the neck, bending him backward. Ms. Ortega also testified that King told her to give him money or he would kill her husband. At this point, she testified, Mr. Ortega also told her to give the men money. She testified that the other robber came behind the counter, pointing at her [with] a gun which had been wrapped in a shirt. She testified that she picked up the cash drawer and handed it to the robber next to her. She testified that he took the money out of the drawer and then demanded "everything." She testified that he also ordered her not to look at his face. Ms. Ortega also testified that she remembered that she generally kept a few separate envelopes with cash and checks, and she gave him these envelopes as well. She also testified that the man then told King to move Mr. Ortega over to the counter, and when her husband was at the counter, the man ordered them to kneel on the floor. She testified that they complied with this order. She also testified that

she said, "Levar, don't shoot us." There was no reply, and they learned the robbers had gone.

Ms. Ortega also testified that while her husband called the police, she ran to the main office and reported the robbery. When the police arrived, she gave the officers King's name, explaining he had worked at the company in the past. She also testified that she later viewed a single photograph, which she positively identified as portraying King. She testified that she could not remember what color shirt King was wearing at the time of the robbery. When questioned, she recalled that she testified at an earlier proceeding that King was wearing a white T-shirt. She also did not recall telling the police that King was wearing a gray T-shirt. She described the shirt as a casual shirt. However, she positively identified King as the man who held her husband during the robbery, and she estimated the distance between the place where King held her husband and the counter behind where she stood was five to ten feet.

Detective Salvatore Caronna testified at trial that he responded to the call of the robbery. He testified that he met with Mr. and Ms. Ortega, who told him that one of the robbers was Levar King, who used to work for the company. He testified that he received King's work records, which listed his address from the year before. He then left the scene, went to the police station, and obtained a photograph of King. Detective Caronna returned to the scene and separately showed Mr. and Ms. Ortega this photograph. They each separately identified the man in the photograph as Levar King. He testified that both victims signed the back of the photograph. He also testified that he spoke with people who had

written the checks stolen in the robbery, but he did not receive any further information about the checks, nor were the checks ever recovered. He admitted in his testimony that the address listed on the employment records was the same address where King lived when he was arrested, but he explained in his testimony that he did not look for King there, nor request a search warrant for the address, because he thought the residence might have been that of King's parents. Detective Caronna admitted, however, that he did not investigate to determine if King lived at that address, noting that officers from the Special Operations Division usually executed arrest warrants.

Officer Louis Lebat testified at trial that he also investigated the robbery, and he directed the crime lab personnel on the scene. He testified that he instructed the technician to dust the area around the counter and the cash drawer for fingerprints. He testified that no prints were lifted. He also testified that he would have directed the technician to dust any other surface if the victims had told him the robbers had touched it. He testified that after the victims identified King as one of the robbers, he obtained an arrest warrant for King.

The parties stipulated at trial that at the time of his arrest, half a month after the robbery, the address listed on the police report was the same as that listed on King's employment records. In addition thereto, the parties stipulated that, at the time of his arrest, King had four upper gold teeth.

8

## IV. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact. Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2). *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning. A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

9

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## V. ANALYSIS

### A. Ineffective Assistance of Counsel

The seminal Supreme Court decision regarding ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. To prove prejudice under the *Strickland* standard, petitioner "must show that there is a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

Petitioner claims that he received ineffective assistance of counsel by virtue of counsel's failure to pursue a defense based upon the fact that petitioner was a drug addict, that he was remorseful, and, most importantly, that he had no idea that his "co-perpetrator" had a gun and planned to use a gun in robbing the victims. According to petitioner, had counsel brought these matters to the jury's attention and offered them as a defense, the jury would not have found him guilty of armed robbery because he lacked the requisite intent.

La. R.S. 14:64(A) provides that armed robbery is "the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon."

In the instant matter, petitioner was charged as a principal. La. R.S. 14:24 provides that "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."

Generally, "[o]nly those persons who knowingly participate in the planning or execution of a crime are principals." *State v. Hebert*, 688 So.2d 612, 617 (La. App. 2 Cir. 1997) (citation omitted). The *Hebert* court elaborated that "[m]ere presence at the scene is

11

not enough to 'concern' an individual in the commission of the offense" and, "[a]n individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state." *Id*. (citations omitted).

For purposes of finding one guilty of armed robbery, the State need only prove "general intent". *Id*. Thus, to prove petitioner guilty of armed robbery, the State was required to show that petitioner, "in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." LSA-R.S. 14:10(2).

In the factually similar case of *State v. Hebert*, 688 So.2d at 617, defendant was a part-time worker at the store which was the target of a planned robbery. Defendant, pretending not to be a part of the robbery scheme, preceded the robber inside the store, instructed the store's assistant manager to comply with the armed robber's demands, got down on his knees and prayed aloud that he and the assistant manager would not be shot, then, after the armed robber had taken the money and fled, cautioned the assistant manager not to leave the store because the robber would return and shoot them.

Defendant argued, on appeal, that he could not constitutionally be convicted of armed robbery since there was nothing to suggest that he desired or knew his co-perpetrator, in carrying out the planned robbery, would use a dangerous weapon. According to defendant, "at best he was guilty only of simple robbery...." *Id*.

The state appellate court rejected defendant's argument, determining that "the jury could have rationally inferred that armed robbery was what defendant had in mind." *Id*. The court reasoned:

> [D]efendant assented to the use of the gun throughout the entire course of the robbery. He created the impression of being forced inside the door at gunpoint-indeed that was the story he first told the police. Defendant continued the ruse by going down on his knees and praying that he and Ms. Hill [the assistant manager] would not be shot. Thus, in the unlikely event that defendant did not initially plan for Jones [defendant's co-perpetrator] to use a weapon during the robbery, his ratification of its use during the robbery sufficed for a rational trier of fact to find him guilty as a principal.

*Id*.

Similarly, in the instant matter, even if petitioner did not initially plan for his co-perpetrator to use a gun in robbing his former place of employment, petitioner clearly ratified its use during the robbery. Both Mr. and Ms. Ortega testified that petitioner threatened to kill Mr. Ortega if Ms. Ortega did not hand over the money. Further, when Ms. Ortega pled with petitioner not to "shoot them," petitioner did not reply, thereby acquiescing in his co-perpetrator's use of a gun in robbing Mr. and Ms. Ortega.

Thus, the court finds that petitioner suffered no prejudice by virtue of counsel's failure to present to jurors the fact that petitioner was not aware that his partner in crime intended to use a gun in perpetrating the robbery. Petitioner, by virtue of his actions during the robbery, clearly ratified his co-perpetrator's use of a gun, thereby satisfying the general

13

intent requirement of the armed robbery statute. Likewise, counsel's alleged failure to bring to jurors attention the fact that petitioner was a drug addict and felt remorse for his actions in robbing Mr. and Ms. Ortega and threatening to kill Mr. Ortega, did not prejudice petitioner as such facts did not impact a finding that the requisite elements of armed robbery had been proven. Further, such factors would not have affected the sentence petitioner received as the court sentenced petitioner to a statutory-minimum of forty-nine and a half years.[5]

### B. Trial Court Erred in Failing to Conduct Post-Conviction Evidentiary Hearing

Petitioner argues that the trial court erred in failing to conduct an evidentiary hearing with regard to his claim of ineffective assistance of counsel which he raised in his post-conviction application. In support of this claim, petitioner cites state law which the trial court allegedly violated in failing to conduct a post-conviction evidentiary hearing.

It is well established that federal habeas review is limited to questions of constitutional dimension. *See generally Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir. 1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v. Johnson*, 141 F.3d 218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141 L.Ed.2d 788 (1998). In reviewing a state court determination, such as whether to conduct an evidentiary hearing or not, the federal habeas court's role "'is limited to determining

---

[5]LSA-R.S.15:529.1 provides that a second-felony offender, such as petitioner, must receive a sentence of "not less than one-half the longest term ... for a first conviction". The longest term for a first armed robbery conviction is ninety-nine years.

14

whether a trial judge's error is so extreme that it constituted denial of fundamental fairness.'" *Andrade v. McCotter* 805 F.2d 1190, 1193 (5th Cir. 1986), *quoting Mattheson v. King,* 751 F.2d 1432, 1445 (5th Cir.1985).

In the instant matter, this court has determined that petitioner's counsel was not unconstitutionally ineffective. Correspondingly, petitioner clearly suffered no constitutional violation by virtue of the state district court's failure to conduct an evidentiary hearing with regard to his ineffectiveness claim.

Accordingly;

## **RECOMMENDATION**

It is hereby **RECOMMENDED** that the petition of Levar King for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** with prejudice.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. *Douglass v. United Services Auto. Ass'n*,

79 F. 3d 1415, 1430 (5th Cir. 1996).

New Orleans, Louisiana, this  25th  day of    September   , 2009.


                                          */s/ Louis Moore, Jr.*
                                          LOUIS MOORE, JR.
                                        UNITED STATES MAGISTRATE JUDGE